# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

REGAL CINEMAS, INC.,

<em>Plaintiff,</em>

v.

TOWN OF CULPEPER,

<em>Defendant.</em>

CASE NO. 3:21-cv-4

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

Plaintiff Regal Cinemas, Inc. ("Regal"), has filed the present action against the Town of Culpeper, Virginia ("the Town"), for unlawfully terminating the parties' lease agreement. Regal raises the following four counts in its Complaint: (1) declaratory judgment, (2) injunctive relief, (3) equitable estoppel, and (4) breach of contract. The Town has moved to dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The Court held a hearing on the motion on June 4, 2021, and the matter is ripe for decision. For the reasons explained below, the motion will be granted in part and denied in part.

## I.     ALLEGED FACTUAL BACKGROUND

For purposes of ruling on the motion to dismiss, the Court accepts as true the following allegations set forth in the Complaint.

### A.  The Lease

On April 29, 1999, R/C Theatres Management Corporation ("R/C") entered into a twenty-year lease agreement (the "Lease") with the Town for property located at 210 South Main Street, Culpeper, Virginia 22701 (the "Property"). *Id.* ¶¶ 1, 10. The Property was "partially or wholly undeveloped" when the parties executed the lease and, as part of their agreement, R/C agreed to

construct a movie theater complex there at its own expense.  *Id.* ¶¶ 12–13.  R/C constructed and operated a movie theater complex on the Property at its own expense, and in exchange, R/C negotiated favorable annual rent payments based on R/C's total gross receipts for the prior year. *Id.* ¶¶ 14–15.

In 2005, Regal purchased the leasehold estate and personal property from R/C.  *Id.* ¶ 16. Regal accordingly assumed the Lease and all obligations thereunder pursuant to a Consent of Landlord dated March 24, 2005, an Assignment and Assumption of Lease Agreement dated April 28, 2005 ("Assignment"), and a Memorandum of Lease dated April 28, 2005.  *Id.*  Regal and the Town agreed that Regal's lease would be subject to all of the terms, covenants, and conditions set forth in the Lease, and at the time Regal assumed the Lease, the Town was aware that Regal would continue using the Property to operate a movie theater.  *Id.* ¶¶ 18–19.  On October 29, 2019, Regal exercised its right to extend the Lease for five years, until April 30, 2025.  *Id.* ¶ 22.

## B.  The Early Termination and Default Provisions

Section 19 of the Lease allows the Lease to be terminated in certain circumstances.  Section 19 reads:

> <u>Early Termination</u>:  In the event that Tenant vacates, abandons or deserts the Property, or ceases operating its movie theatre business at the Property for a period of one hundred twenty days (120) or more, without opening or reopening as the case may be, and except for the making of necessary renovations or repairs following a fire or other casualty, Landlord may, at its sole option, declare the Tenant in default and terminate this Lease by giving written notice of such termination and of the effective date thereof to Tenant. Upon giving such notice, this Lease shall cease and come to an end as of the date set forth in said notice with the same force and effect as if such date had originally been set forth herein as the expiration date of this Lease.  Tenant shall deliver possession of the Property to Landlord free and clear of all liens and encumbrances, but Tenant shall remain liable under any indemnities and other provisions designated herein to survive the expiration or termination of the

> Lease. Landlord shall have each and all the remedies provided for default in this Lease.

Compl. Ex. 1 § 19, ECF No. 1-1.  Regal maintains that pursuant to Section 19, early termination is not possible unless the Town (1) gives Regal written notice and (2) allows Regal 30 days from the date of the written notice to cure the alleged default.  Compl. ¶ 31.  To this end, Section 20 of the Lease specifies various scenarios in which Regal is in default under the Lease, including "[i]f [Regal] defaults in or breaches the observance or performance of any other covenant, condition, agreement or provision contained in this Lease, unless such default is remedied within thirty (30) days after *written* notice is given to [Regal]."  Compl. Ex. 1 § 20.

### C.  Regal Temporary Closes the Theater During the COVID-19 Pandemic

In the wake of the COVID-19 Pandemic and Governor Northam's Executive Order Number 53, Regal closed its Culpeper movie theater to the public on March 23, 2020.  Compl. ¶¶ 34, 36.  The Executive Order allowed for theaters such as Regal to reopen the movie theater with limited capacity and various restrictions on July 1, 2020.  *Id.* ¶ 37.  Regal did so on August 28, 2020, but it temporarily suspended its operations again on October 9, 2020, "due to low attendance, lack of film product, and safety concerns, as the Commonwealth continued to report thousands of positive COVID-19 cases each day."  *Id.* ¶ 39.

Regal maintains that it used the temporary suspensions to perform maintenance and repairs and to make safety modifications.  *Id.* ¶¶ 40–41.  Moreover, Regal attests it has not abandoned or vacated the Property, has never fully or permanently ceased operations on the Property, and "has continued to operate its movie theatre business on the Property, including by maintaining the Property, continuing to supply the Property with all utilities, preparing the Property for re-opening, and employing personnel to monitor the Property."  *Id.* ¶¶ 43–45.

### D. The Town's Response

Due to the revenue declines Regal experienced during the COVID-19 pandemic, Regal did not pay the Town its quarterly rent payments on time during 2020.  *Id.* ¶ 46.  Regal then began negotiating with the Town to enter a payment plan for the rent arrears.  *Id.* ¶ 48.  During the negotiations, the Town, "and specifically its Treasurer, Howard Kartel, assured Regal of the Town's support of Regal and its lease of the Property, even stating that the Town was looking forward to Regal's re-opening in the spring of 2021."  *Id.* ¶ 50.  Kartel further informed Regal that it would owe less in rent the next year.  *Id.* ¶ 51.  Relying on Kartel's assurances, "Regal engaged in negotiations with the Town to establish a payment plan for past due rent, and planned to reopen to the public in the spring, but took no further or alternative action to protect its rights and interests under the Lease."  *Id.* ¶ 52.  The Town, however, "had no intention of negotiating with Regal in good faith, and instead was waiting for the purported 120-day clock to pass to attempt to invoke the early termination provision in the Lease, without providing the proper notice and cure period."  *Id.* ¶ 53.

On January 27, 2021, Kartel notified Regal that the Town would not allow any abatement of the past due rent and that the Town "understood that the rent for the upcoming annual period was expected to be fairly nominal."  *Id.* ¶ 54.  Kartel also stated that it would not be an issue for Regal to make payments on all amounts owed and that Kartel would follow up with Regal after the next Culpeper Town Council meeting.  *Id.*  Regal alleges, however, that Kartel never did so.  *Id.* ¶ 55.

On February 10, 2021, the Town sent Regal a "letter purporting to terminate the Lease under Section 19 of the Lease . . . ."  *Id.* ¶ 56.  Regal refers to this letter in the Complaint as the "Purported Termination Notice."  *Id.*  The Notice alleged that Regal was in default under Section

19 of the Lease because it had stopped operating the movie theater at the Property "for a continuous period in excess of 120 days, namely October 9, 2020, through February 9, 2021." *Id.* ¶ 58 (quoting Compl. Ex. 7 at 2, ECF No. 1-7). The Notice "also purports to put Regal on notice of a default under Section 6 of the Lease for failure to pay rent for the period from May 1, 2020, through February 2021 and associated late fees in the amount of $56,428.65." *Id.* ¶ 64. Regal alleges that the Town has "acknowledged that Regal has 30 days to cure its alleged default for failure to pay rent and associated late fees." *Id.* ¶ 65.

Regal alleges that the Town is incorrect in alleging that Regal ceased its movie theater operations, as "Regal has not vacated, abandoned, or deserted the Property, nor has it ceased operating its movie theatre business at the Property for 120 days or more." *Id.* ¶ 59. But even assuming Regal did fully cease operations for 120 days, "the Purported Termination Notice provided Regal with no opportunity to cure its alleged default, instead declaring that the Lease was to be terminated effective just three dates later on February 13, 2021." *Id.* ¶ 61 (citing Compl. Ex. 7 at 2.) Regal maintains that the Town's "lack of notice and lack of opportunity to cure is a plain and material breach of the Town's obligations under the Lease." *Id.*

One day later, on February 11, 2021, the Town's Treasurer "doubled down and refused to reconsider the Town's purported termination" and notified Regal it would inspect the movie theater's premises on February 16, 2021. *Id.* ¶ 62. The Town also expressed its intent to seek bids to prospective tenants for a new lease of the Property. *Id.* On February 12, 2021, Regal sent the Town a check "in full satisfaction of the rent and late fees" that Regal purportedly owed. *Id.* ¶ 66. In doing so, Regal "thereby cur[ed] in full any alleged default for failure to pay rent within the required cure period." *Id.*

## II.    LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv.*, LLC, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotations omitted). And the court cannot "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics"; instead, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Still, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679.

## III.    ANALYSIS

The Town argues that each count fails to state a claim under Federal Rule of Civil Procedure 12(b)(6).  The Court will first address Regal's breach of contract claim before discussing its remaining claims.

### A.  Breach of Contract

Count IV alleges breach of contract.  To state a claim for breach of contract in Virginia, a plaintiff must show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 619 (Va. 2004).  When interpreting a contract, courts in Virginia follow the "plain meaning" rule. *Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 374 S.E.2d 10, 12 (Va. 1988).  Courts must therefore "construe the contract as a whole, striving not to place emphasis on isolated terms wrenched from the larger contractual context." *Babcock v. Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 244 (Va. 2016).  This in turn requires "giv[ing] effect to all of the language in a contract if its parts can be read together without conflict." *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983).

Moreover, whether a contractual provision is ambiguous is a matter of law for the Court to determine. *Pocahontas Min. Ltd. Liability Co. v. CNX Gas Co., LLC*, 666 S.E.2d 527, 530 (Va. 2008).  "An ambiguity exists when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Id.* at 531.  However, "[t]he mere fact that the parties disagree about the meaning of the contract's terms is not evidence that the contract language is ambiguous." *Id.*  Courts ascertaining whether a contract is ambiguous "consider the words employed by the parties in accordance with their usual, ordinary, and popular meaning." *Id.*  "No word or phrase

employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it, and there is a presumption that the contracting parties have not used words needlessly." *Id.*

Count IV alleges that the Town breached the Lease by (1) attempting to terminate it early pursuant to Section 19 when the factual requirements of Section 19 were not satisfied, (2) attempting to terminate the lease early without providing 30 days' written notice and an opportunity to cure, and (3) "interfering with and hindering Regal's quiet enjoyment of the Property, including by purporting to terminate the Lease, and threatening to re-take the Property, impair Regal's access to the Property, and interfere with Regal's business operations on the Property." Compl. ¶¶ 93–95. The Town argues that because Regal ceased its operations for 120 days, Section 19 allowed the Town to terminate the lease early. The Town also asserts that it owed Regal no obligation to provide Regal with 120 days' written notice and an opportunity to cure before terminating the Lease.

As stated previously, Section 19 of the Lease allows for termination under circumstances. It reads:

> <u>Early Termination</u>:  In the event that Tenant vacates, abandons or deserts the Property, or ceases operating its movie theatre business at the Property for a period of one hundred twenty days (120) or more, without opening or reopening as the case may be, and except for the making of necessary renovations or repairs following a fire or other casualty, Landlord may, at its sole option, declare the Tenant in default and terminate this Lease by giving written notice of such termination and of the effective date thereof to Tenant. Upon giving such notice, this Lease shall cease and come to an end as of the date set forth in said notice with the same force and effect as if such date had originally been set forth herein as the expiration date of this Lease.  Tenant shall deliver possession of the Property to Landlord free and clear of all liens and encumbrances, but Tenant shall remain liable under any indemnities and other provisions designated herein to survive the expiration or termination of the Lease. Landlord shall have each and all the remedies provided for default in this Lease.

Compl. Ex. 1 § 19.  Regal first argues that the Town's attempted termination pursuant to Section 19 breached the Lease because Regal never vacated the Property or ceased its movie theater operations for 120 days.  But even if it did stop operating its movie theater business for at least 120 days, Regal argues that the Town improperly failed to give Regal 30 days' written notice and an opportunity to cure.  For the following reasons, the Court disagrees and concludes that Count IV must be dismissed.

### 1. Operations Cessation

The parties dispute whether Regal ceased its movie theater operations for 120 days.  The Town points out that Regal's own Complaint alleges that Regal "temporarily suspended its operations on October 9, 2020, due to low attendance, lack of film product, and safety concerns," and that as of the Complaint's February 15, 2021, filing, the theater "remain[ed] temporarily closed to the public . . . ."  Compl. ¶¶ 39, 42.  The Complaint therefore alleges that Regal suspended its operations for at least 120 days, the Town argues.  Regal, however, disputes that it ceased its movie theater operations and notes that the Complaint alleges that during the time it closed the theater to the public, "Regal used these temporary suspensions to conduct modifications necessary due to the COVID-19 pandemic, including (but not limited to), investing in and installing sanitation equipment," and "performed necessary maintenance and repairs to protect the building from water intrusion, service the HVAC system, and otherwise engaged in activity to prevent the deterioration of the premises."  *Id.* ¶¶ 40–41.  The Complaint also alleges that "at no point has Regal ever abandoned or vacated the Property, nor has Regal fully or permanently ceased operations on the Property at any point."  *Id.* ¶ 43.

The Court concludes that per Section 19's plain language and the Complaint's own allegations, Regal ceased its operations for 120 days.   For the Town to have validly terminated the Lease under Section 19, Regal must either have:

> vacate[d], abandon[ed] or desert[ed] the Property, or cease[d] operating its movie theatre business at the Property for a period of one hundred twenty days (120) or more, *without opening or reopening as the case may be*, and except for the making of necessary renovations or repairs following a fire or other casualty.

Compl. Ex. 1 § 19 (emphasis added).   Although the Lease does not expressly define what constitutes Regal's "operating its movie theatre business," Section 19 includes the text "without opening or reopening as the case may be." *Id.*  Keeping the theater open to the public, therefore, is a requisite to "operating," meaning that should Regal cease its movie theater operations, the only way under Section 19 to avoid default is to "open[] or reopen[]" before 120 days have accrued. The Complaint itself alleges that Regal did not do so.  Compl. ¶¶ 39, 42.

Moreover, per Section 6 of the Lease, the Regal's annual rent is based on its "total gross receipts for the prior year." *Id.* § 6.  Indeed, pursuant to Section 6(a), "[w]here [Regal's] gross receipts for the prior year were between $0 and $100,000, [Regal] shall pay 1.5% of the total of such gross receipts as annual rent," meaning that were Regal to earn no gross receipts in a particular year, it would owe the Town no rent the following year. *Id.* § 6(a).  Section 19, therefore, addresses this risk by allowing the Town to terminate the lease and avoid a situation in which a tenant remains closed to the public indefinitely and accrues no rent obligation for the following year.  Regal's argument that its closure did not constitute an operations cessation under Section 19 because it made renovations and maintenance repairs is therefore unconvincing.

Finally, the Court is also convinced that Regal's maintenance work did not constitute "the making of necessary renovations or repairs following a fire or other casualty." *See* Compl. Ex. 1

§ 19. Section 13, titled "Damage by Fire or Act of God," provides useful context on this issue.

*See id.* § 13. Aside from its use in Section 19, the term "casualty" appears only in Section 13. *Id.*

Section 13 stipulates, *inter alia*, that:

> If the Complex or other improvements on the Property, or any part
> thereof, are damaged or destroyed by fire, flood, natural causes, or
> other casualty, [Regal] shall promptly notify [the Town] of such
> destruction or damage; and [Regal] with reasonable promptness and
> diligence shall rebuild, replace and repair any damage or destruction
> to the Property, at its sole cost and expense, to the extent of
> insurance proceeds available, in conformity with the requirements
> of Paragraph 11 above, so that after the completion of such repairs
> the Property shall be, as nearly as possible, in a condition as good as
> and having the value as great as the condition and value thereof
> immediately prior to such damage or destruction.

*Id.* Section 13 also stipulates that in instances in which "the Property is substantially damaged or

destroyed in any single casualty so that the Property shall be unsuitable for restoration for [Regal's]

continued use and occupancy," instead of rebuilding, Regal may give notice to the Town of its

intent to terminate the Lease. *Id.* Section 13's plain language therefore only contemplates

instances of *physical* "damage or destruction" to the Property, and not for maintenance to account

for a virus such as COVID-19. Section 19's reference of "fire or other casualty" thus also only

pertains to physical damage or destruction. The Court accordingly concludes that Regal's

maintenance work during the COVID-19 pandemic does not qualify as "the making of necessary

renovations or repairs following a fire or other casualty" under Section 19.

Other courts have held similarly. In *Gap Inc. v. Ponte Gadea New York LLC*, the United

States District Court for the Southern District of New York considered whether the COVID-19

pandemic's effects applied to a lease agreement clause which provided that in the event of a "fire

or other casualty," the tenant was obligated to "notify Landlord promptly of any fire or other

casualty that occurs in the Premises" and "repair the damage to the Premises to the extent caused

by fire or other casualty," except for in certain enumerated circumstances. __ F. Supp. 3d. __, No. 20 CV 4541-LTS-KHP, 2021 WL 861121, at *2 (S.D.N.Y. Mar. 8, 2021). After noting that the clause at issue "refer[red] in several instances to a 'fire or other casualty' causing 'damage' occurring 'in' or 'to' the 'Premises,' and describe[d] in detail the restoration obligations of the parties in the event such damage occur[red]," the court concluded that "casualty" referred only "to singular incidents, like fire, which have a physical impact in or to the premises . . . ." *Id.* at *6. The court accordingly found that "the COVID-19 pandemic and its effects did not constitute a casualty" under the lease agreement. *Id.* at *7.

In sum, the Court finds that under the Lease's plain language and Regal's own Complaint, Regal ceased its movie theater operations for at least 120 days. Moreover, Regal's maintenance work during that time period to account for the COVID-19 pandemic did not constitute "the making of necessary renovations or repairs following a fire or other casualty" and thus did not exempt Regal from the 120-day time frame.

### 2. Notice and Cure Requirement

Regal next argues that even if it did cease its movie theater operations at the Property for 120 days, the Lease required the town to give Regal 30 days' written notice and an opportunity to cure before it moved to terminate the Lease. In support, Regal points to Section 20 of the Lease, which enumerates several scenarios in which Regal is officially in "default" under the Lease, including when Regal "breaches the observance or performance of any other covenant, condition, agreement or provision contained in this Lease, unless such default is remedied within thirty (30) days after *written* notice is given to [Regal]." Compl. Ex. 1 § 20. Regal contends that the obligation to give 30-days written notice and an opportunity to cure in Section 20 also applies to the Town's ability to terminate the Lease early under Section 19. The Court does not agree.

First, the Court notes that Section 19 makes no mention of a either a 30-day written notice requirement or an opportunity for Regal to remedy its default before the Town may terminate the Lease early. *See id.* § 19. Instead, Section 19 only provides that should Regal cease its movie theater operations for at least 120 days straight, the Town "may, at its sole option, declare [Regal] in default and terminate this Lease by giving *written notice* of such termination and of the effective date thereof to [Regal]." *Id.* Given that "[n]o word or phrase employed in a contract will be treated as meaningless if a reasonable meaning can be assigned to it," and that "there is a presumption that the contracting parties have not used words needlessly," the Court concludes that had the parties wished to impose a notice-and-cure requirement on the Town before it could terminate the Lease under Section 19, they would have done so expressly. *CNX Gas*, 666 S.E.2d at 530.

Additionally, it is not clear to the Court how a "cure" is even possible in the event of a 120-day lapse in movie theater operations. Indeed, once its operations closure accrues 120 consecutive days, Regal has no means of "turning back the clock." By February 5, 2021, Regal's movie theater operations had remained closed to the public for 120 days straight, and Regal could do nothing to alter this accrual. The Court therefore finds, as a matter of law, that the Lease unambiguously does not require that the Town allow Regal 30-days' written notice and an opportunity for Regal to cure under Section 19, and Count IV fails to state a claim for breach of contract.

### 3. Excuse

Lastly, Regal asserts that even if it defaulted under Section 19 of the Lease, this default was "excused by the doctrines of *force majeure*, frustration of purpose, failure of consideration, illegality, impossibility, and/or impracticability of performance." Compl. ¶ 92. In sum, Regal contends that the Town's attempted termination constitutes a breach because any default by Regal was excused. Again, the Court is not persuaded.

The doctrines Regal cites are affirmative defenses. *See JTH Tax, LLC v. Shahabuddin*, 477 F. Supp. 3d 477, 482 (E.D. Va. 2020) ("Impossibility is an affirmative defense under Virginia law."); *CMA CGM S.A. v. Leader Int'l Express Corp.*, 474 F. Supp. 3d 807, 815–18 (E.D. Va. 2020) (referring to frustration of purpose, impossibility, impracticability, and force majeure as affirmative defenses); Fed. R. Civ. P. 8(c)(1) (listing "failure of consideration" and "illegality" as affirmative defenses). As Regal acknowledges in its opposition brief, they are not independent bases to make out a prima facie claim for breach of contract. *See* Pl.'s Mem. Opp'n Mot. Dismiss 21, ECF No. 13. To state a claim for breach of contract, Regal must show that the Town breached an enforceable obligation it owed Regal and, in doing so, caused Regal to suffer damages. *Filak*, 594 S.E.2d at 619. If anything, in asserting it was excused from performing, Regal argues that no enforceable obligation existed between the parties. Thus, even if Regal could show that any of the above-cited defenses excused its performance under the lease, it would not support a breach of contract claim against the Town. The Court will therefore dismiss Count IV.

### B. Declaratory Judgment

Count I requests a declaratory judgment concerning the parties' rights and obligations under the Lease. The Declaratory Judgment Act gives federal courts the authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Courts have jurisdiction in declaratory actions "when three essentials are met: (1) the complaint alleges an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment; (2) the court possesses an independent basis for jurisdiction over the parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction." *Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 592 (4th Cir. 2004).

But even when they have jurisdiction, "district courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act . . . ." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). A court must, however, have "good reason" for declining to exercise its declaratory judgment jurisdiction. *Volvo*, 386 F.3d at 594 (4th Cir. 2004). "In determining whether to exercise declaratory jurisdiction, the court must consider whether declaratory relief would 'serve a useful purpose in clarifying and settling the legal relations at issue,' and whether the judgment would 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Metra Indus. v. Rivanna Water & Sewer Auth.*, No. 3:12CV00049, 2014 WL 652253, at *2 (W.D. Va. Feb. 19, 2014) (quoting *Volvo*, 386 F.3d at 594).

"[A] declaratory judgment action is an inherently forward-looking mechanism, intended to guide parties' behavior in the future." *Fluor Fed. Sols., LLC v. BAE Sys. Ordnance Sys., Inc.*, No. 7:190cv000698, 2021 WL960645, at *6 (W.D. Va. Mar. 15, 2021) (quoting *Merino v. EMC Mortg. Corp.*, No. 1:09-cv-1121, 2010 WL 1039842, at *4 (E.D. Va. Mar. 19, 2010)). Such relief, therefore, "is unavailable in situations where claims and rights asserted have fully matured, and the alleged wrongs have already been suffered." *AvePoint, Inc. v. Knickerbocker*, 475 F. Supp. 3d 483, 488 (E.D. Va. 2020) (cleaned up); *see also Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 695 (E.D. Va. 2010) ("Declaratory judgments . . . are untimely if the questionable conduct has already occurred or damages have already accrued.") (alteration omitted).

As a preliminary matter, the Court has jurisdiction to hear the declaratory judgment claim. First, the Complaint alleges a controversy between Regal and the Town "of sufficient immediacy and reality to warrant issuance of a declaratory judgment," as the parties dispute whether the Town has effectively terminated its lease with Regal. Second, the Court has diversity jurisdiction over

the parties. Regal is incorporated in Tennessee and maintains its headquarters in Tennessee, while the Town is an incorporated town in Virginia, and the amount-in-controversy exceeds $75,000. Compl. ¶¶ 5–7.

Moreover, the Court does not believe that exercising its declaratory judgment jurisdiction would constitute an abuse of discretion. The Complaint alleges that the Town has only *attempted* to improperly terminate the Lease and describes the attempt as merely a "purported termination." *See* Compl. ¶¶ 1, 62, 69, 70. The Complaint further alleges that this "purported termination" was "improper and ineffective," and that "as of the date of [the Complaint's] filing, . . . Regal intends to re-open the theatre shortly." *Id.* ¶¶ 42, 70. A declaratory judgment could therefore serve a useful purpose in clarifying Regal's and the Town's rights and obligations under the Lease and "guide [the] parties in their future conduct in relation to each other, thereby relieving them from the risk of taking undirected action incident to their rights." *Seneca Ins. Co. v. Shipping Boxes I, LLC*, 30 F. Supp. 3d 506, 511 (E.D. Va. 2014) (quoting *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Sup'rs*, 737 S.E.2d 1, 7 (Va. 2013)).

Concerning the merits of Regal's declaratory judgment request, the Court concludes that at least part of Count I must survive the motion to dismiss. As discussed previously, the Court finds that per Regal's own Complaint and the Lease attached thereto, Regal ceased its movie theater operations for 120 days, Regal's maintenance work did not constitute the "making of necessary renovations or repairs following a fire or other casualty," and the Town owed Regal no obligation to provide 30 days' written notice and an opportunity to remedy its default due to the operations cessation. The Court therefore cannot issue a declaratory judgment that (1) the Town's "purported termination of the Lease was ineffective and is of no legal consequence"; (2) "the Lease remains in full force and effect"; (3) Regal's current temporary suspension of its movie theater

operations during the COVID-19 pandemic does not constitute a cessation under Section 19 of the Lease; (4) "any period during which Regal was conducting necessary modifications or repairs at the theatre relating to COVID-19 does not count towards the 120-day item period in section 19"; and (5) the Town must provide Regal with written notice of default and 30 days to cure before any early termination under Section 19 of the Lease becomes effective. Compl. ¶ 72.

However, Regal alternatively requests that the Court issue a declaratory judgment that Regal's operations cessation is excused and that the Town "cannot terminate the lease early notwithstanding Section 19, under the doctrines of *force majeure*, frustration of purpose, illegality, impossibility, impracticability, and/or failure of consideration." *Id.* ¶ 73. Again, these doctrines are affirmative defenses. At the Rule 12(b)(6) stage, however, courts "generally cannot reach the merits of an affirmative defense" except for "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint . . . ." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Courts may only do so when "all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Id.* (cleaned up). The Court will accordingly address each of the above-cited doctrines in turn.

While the Lease does not explicitly mention the term "force majeure," Section 13 covers "Damage by Fire or Act of God" and therefore most closely resembles a traditional force majeure clause. "In interpreting any force majeure provision, courts must construe contracts as they are written." *CMA CGM S.A.*, 474 F. Supp. 3d at 818 (citing *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1086 (E.D. Va. 2011)). And as discussed above, Section 13 only contemplates instances of physical "damage or destruction" to the Property. *See* Compl. Ex. 1 § 13. The Complaint alleges no physical damage to the property, meaning Section 13 does not excuse Regal from performing under the Lease. The Court finds that "all facts necessary to the

affirmative defense appear on the face of the complaint" and will accordingly grant the motion to dismiss as to Regal's request for declaratory judgment on this proffered excuse for performing under the Lease. *Goodman*, 494 F.3d at 464.

The Court is also persuaded that Regal is not exempt from performing under the defense of illegality. In Virginia, "a party who consents to, and participates in, an illegal act cannot recover damages from other participants for the consequences of that act." *Vienna Metro*, 786 F. Supp. 2d at 1083 (citing *Johnson v. Campbell*, 521 S.E.2d 764, 766 (Va. 1999)). The Complaint acknowledges that Regal was allowed to reopen its movie theater to the public starting July 1, 2020, but instead "temporarily suspended its operations on October 9, 2020, due to low attendance, lack of film product, and safety concerns, as the Commonwealth continued to report thousands of positive COVID-19 cases each day." Compl. ¶¶ 37, 39. Again, all facts necessary to this affirmative defense appear in the Complaint, and Regal cannot rely on the defense of illegality. The Court will dismiss this portion of its declaratory judgment request.

Frustration of purpose, impossibility of performance, and impracticability are "related but legally distinct defenses" to breach of contract claims. *Drummond Coal Sales, Inc. v. Norfolk So. Ry. Co.*, No. 7:16cv00489, 2018 WL 4008993, at *12 (W.D. Va. Aug. 22, 2018). Frustration of purpose "is narrow and applies to instances 'where a wholly unforeseeable event renders the contract valueless to one party.'" *CMA CGM S.A.*, 474 F. Supp. 3d at 816 (quoting *Caper Corp. v. Wells Fargo Bank, N.A.*, 578 F. App'x 276, 288 (4th Cir. 2014)). The defense requires proof of three elements: (1) "frustration of the principal purpose of the contract"; (2) "the frustration is substantial"; and (3) "the non-occurrence of the frustrating event or occurrence was a basic assumption on which the contract was made." *Drummond Coal Sales*, 2018 WL 4008993, at *15. "In order for frustration of the principal purpose of a contract to be substantial, it must be so severe

that it is not fairly to be regarded as within the risks assumed under the contract." *Id.* (cleaned up). Indeed, "[i]t is not enough that the transaction has become less profitable for the affected party or even that [it] will sustain a loss." *Id.* (internal quotation marks and citation omitted).

Impossibility/impracticability also requires proof of three elements: (1) "the unexpected occurrence of an intervening act"; (2) "that such occurrence was of a character that its non-occurrence was a basic assumption of the agreement of the parties"; and (3) "that occurrence made performance impracticable." *Id.* at *13 (citing *Opera Co. of Boston v. Wolf Trap Found. for the Performing Arts*, 817 F.2d 1094, 1102 (4th Cir. 1987)). The occurrence must be unexpected, but need not necessarily be unforeseeable, and "[t]he question is one of degree—how unexpected at the time the contract was made was the event that prevented performance." *Id.* (citation omitted). Moreover, "performance that has become merely more difficult or unprofitable is not enough to establish objective impracticability." *Id.* at *14 (cleaned up).

Finally, the failure of consideration defense similarly "refers to contracts where originally there was consideration that subsequently failed." *Cabro Foods, Inc. v. Wells Fargo Armored Serv. Corp.*, 962 F. Supp. 75, 78 n.1 (S.D. W. Va. 1997). This defense appears similar, although not identical, to the defenses of frustration of purpose and impossibility/impracticability.

At this stage in the proceedings, the Court cannot rule on whether the doctrines of frustration of purpose, impossibility/impracticability, and failure of consideration exempt Regal from performing under the Lease. Given the unique nature of the COVID-19 pandemic and its affects, discovery is necessary to shed light on the parties' assumptions and expectations when entering into the Lease. In sum, the Court does not find this matter to be one of "the relatively rare circumstance" where the Complaint contains sufficient facts for the Court to rule on the affirmative

defenses of frustration of purpose, impossibility/impracticability, and failure of consideration. The Court will deny the motion to dismiss on this portion of the declaratory judgment request.

In sum, the Court will dismiss all of Count I, except for Regal's request for declaratory judgment that it was excused from performing under the Lease due to frustration of purpose, impossibility/impracticability, and failure of consideration.

## C. Injunctive Relief

Count II seeks entry of an injunction barring the Town from terminating the Lease and from taking possession of the Property. Compl. ¶ 76. Regal seeks "temporary, preliminary, and permanent injunctive relief" enjoining the Town from (1) "terminating the Lease under Section 19 during Regal's current suspension of its full operations due to the COVID-19 pandemic"; (2) re-entering the Property, unless for permitted reasons upon proper notice under the terms of the Lease"; (3) "re-taking possession of the Property"; and (4) "preventing or interfering with Regal's access to the Property, disrupting any of Regal's operations at the Property, or otherwise interfering with Regal's right to quiet enjoyment of the Property." *Id.* ¶ 80.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). These same factors "are pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Id.* at 32; *see also Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

As discussed previously, Regal cannot succeed on the merits on its breach of contract claim. And although Regal may ultimately demonstrate that it was excused from performing and the Town did not effectively terminate the Lease, the Court does not agree at this stage that such success is "likely." Indeed, in proving frustration of purpose, Regal must show that the frustration due to the COVID-19 pandemic is "so severe that it is not fairly to be regarded as within the risks assumed under the [Lease]," and "[i]t is not enough that the transaction has become less profitable for [Regal] or even that [Regal] will sustain a loss." *Drummond Coal Sales*, 2018 WL 4008993, at *15 (cleaned up). And to show impossibility/impracticability, Regal faces a high burden in that "performance that has become merely more difficult or unprofitable is not enough to establish objective impracticability." *Id.* at *14 (cleaned up). Given these high hurdles, the Court does not find that the Complaint demonstrates a likelihood of success on the merits. The Court will dismiss Count II.

### D. Equitable Estoppel

Finally, Count III contends that due to its purposeful misrepresentations it made about its intent to terminate the Lease, the Town is estopped from claiming that the February 10, 2021, termination is effective. Compl. ¶¶ 82–88. "In Virginia, there is no recognized cause of action for equitable estoppel, and the doctrine is usually asserted as a shield rather than a sword."[1] *Virginia Power Energy Mktg., Inc. v. EOT Energy, LLC*, No. 3:11cv630, 2012 WL2905110, at *10 (E.D. Va. Jul. 16, 2012) (cleaned up) (collecting cases); *Nasser v. WhitePages, Inc.*, No. 5:12cv00097, 2014 WL55783, at *1 (W.D. Va. 2014) (same). For this reason, Count III fails to state a claim for relief and must be dismissed.

---

[1] The Lease is governed by Virginia law. *See* Compl. Ex. 1 § 27 ("This Lease and all rights and obligations of the parties hereunder shall be governed by and construed according to the laws of the Commonwealth of Virginia.").

But even if the Court were to consider equitable estoppel as a valid cause of action, Count III would still fail to state a claim. The Complaint does not allege that the parties made any written modifications to the Lease. As the Town points out, Section 30 of the Lease requires that all Lease modifications be made in writing and "executed and acknowledged by each of the Parties," meaning Regal's reliance on any statements by the Town during negotiations was not reasonable. *See* Compl. Ex. 1 § 30. Moreover, the Complaint points specifically to Town treasurer Howard Kartel as the source of the Town's alleged misrepresentations that Regal relied on. *See* Compl. ¶¶ 50–56. The Town of Culpeper Code of Ordinances sets the town manager—and not the town treasurer—as the "custodian of all property belonging to the town," and gives the town manager the authority to "rent town-owned property, including . . . buildings . . . ." Town of Culpeper Code of Ordinances § 2-122. Regal thus cannot plausibly allege that it "reasonably relied on the representations and conduct of the defendant, such that [it] changed [its] position to [its] detriment." *Butler v. Fairfax Cnty. School Bd.*, 780 S.E.2d 277, 282 (Va. 2015) (quoting *Tuomala v. Regent Univ.*, 477 S.E.2d 501, 506 (Va. 1996)). The Court will accordingly dismiss Count III.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Town's motion to dismiss. All claims are dismissed except for Regal's request for declaratory judgment as to excuse due to frustration of purpose, impossibility/impracticability, and failure of consideration.

An appropriate Order will issue.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this 14th day of July, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

22